**PROGRESSIVE ENGINEERING, INC. and Kenneth P. Swanson,**

v.

**MACHINECRAFT, INC., Louis M. Cotchett and Textile Engineering Corporation.**

**Civ. A. No. 56–541.**

United States District Court
D. Massachusetts.

Jan. 15, 1959.

Herbert P. Kenway, and Albert Adelson, Boston, Mass., for plaintiff.

Cedric W. Porter, Boston, Mass., for defendant.

WYZANSKI, District Judge.

The principal issues tendered in this litigation involve questions as to the validity and infringement of U. S. Patents Nos. 2,525,591, 2,644,202, 2,716,780, and 2,755,515 relating to Ball-Bearing Top Rolls owned by defendant Cotchett and licensed to defendant Machinecraft, Inc.

█ This suit was begun as an action for declaratory judgment by Swanson, a citizen of Massachusetts, and Progressive Engineering, Inc., a Massachusetts corporation, against Cotchett, a citizen of Massachusetts, and Machinecraft, Inc. and Textile Engineering Corporation, both Massachusetts corporations. With respect to patents Nos. 2,525,591, 2,644,-202 and 2,716,780 and application Ser. No. 221,270 (now patent No. 2,755,515), plaintiffs prayed for a declaratory judgment that (a) they have not infringed any of the claims, and (b) the claims are invalid for want of novelty or invention in view of the prior art, if construed to cover any equipment made or sold by plaintiffs. Those prayers for declaratory judgments fall plainly within this Court's jurisdiction. 28 U.S.C. §§ 1338(a) and 2201. Plaintiff also prayed for a declaratory judgment that plaintiff Swanson has not violated any confidential relations between him and any of the defendants. Jurisdiction to hear that aspect of the controversy is promised upon the asserted authority of 28 U.S.C. § 2201 taken in conjunction with the provision in 28 U.S.C. § 1338(b) to the effect that "The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the * * * patent * * * laws." That subsection, more firmly establishing the theory of pendent jurisdiction announced in Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, is now given hospitable treatment by most federal courts. Bullock v. Sears Roebuck & Co., 2 Cir., 239 F.2d 170; Maternally Yours, Inc. v. Your Maternity Shop, 2 Cir., 234 F.2d 538, 544; Darsyn Laboratories v. Lenox Laboratories, D.C. N.J., 120 F.Supp. 42, 53–54; Id., 3 Cir., 217 F.2d 648.

Defendants counterclaimed. They alleged that plaintiffs had infringed the four patents already named, that, in violation of 35 U.S.C. § 50,[1] plaintiffs had falsely marked unpatented top rolls as though they were patented, that plaintiffs had competed unfairly with defendant by making plaintiffs' top rolls so similar in appearance to defendants' that they are passed off and substituted for defendants' top rolls, and that plaintiffs had committed a breach of confidential relations in the use of trade secrets. Jurisdiction was premised on 28 U.S.C. § 1338(a) for the first two branches of the counterclaim and on 28 U.S.C. § 1338(b) for the last two branches.

While like every other patent controversy this case presents some complicated points with respect to the patent claims, the state of the prior art, and the technology of the industry affected, once these points are mastered it seems to this Court that this is an outstandingly strong case of a valid invention and a clear infringement.

As will appear, we are here dealing with one of America's oldest industries that for a long time was baffled by a serious difficulty impeding efficient manufacture. Cotchett invented what in retrospect may seem a simple technological improvement. But simplicity in achieving a result that stumped the experts is often the best indicium of patentability. Here the efficiency and economy of Cotchett's invention in overcoming difficulties theretofore experienced was at once appreciated. The most experienced and sophisticated suppliers of machinery saw its novelty and utility. From 1948 to 1958 2,000,000 rolls embodying Cotchett's invention were manufactured.

---

1. Now 35 U.S.C. § 292.

Of 18,000,000 available spindles in the United States 4,000,000 were supplied by Machinecraft with Cotchett rolls, called Climax ball-bearing top rolls. And one of the putative infringers' own witnesses, a man of the highest industrial and testimonial qualifications, went far to support the patentee's version of the significance of his contribution to the art.

Ball-bearing top rolls are used in the drafting of textile fibers, in spinning them into yarns in the process of drawing out the fibers to align them, and to provide an approximately uniform number of fibers throughout the length of the yarn being spun.

Before 1945 top rolls were of two types —solid type rolls made of cast iron and rotated as a unit in the drawing operation, and ball-bearing top rolls of the so-called Campbell type.

Solid type rolls had been in use in textile mills for at least 200 years. They were unsatisfactory because they could not run without constant lubrication. If the oil was not carefully applied, the rolls would pick up lint, cause the strands to wrap around the cot, and thus break the strands and stop the spinning on that roll. The line clogged the bearings and the oil would get on the yarn so that the cloth could not be uniformly dyed.

These difficulties became more significant after 1949 when long or high draft spinning was introduced. One inch of roving instead of being drawn out to make 13 to 18 inches of yarn, is drawn out into 20 to 60 inches of yarn. This higher draft necessarily increased the speed of rotation of the front rolls, and required much heavier weighting of the rolls to grip the fibers. The solid top rolls could not stand the weighting required for high drafting, because the rolls rotated as a unit and the friction caused by the greater weighting rapidly burned up the bearings.

In an attempt to overcome the problems created by solid type rolls, as far back as the 1880's Campbell designed, and Whitin Machine Works, one of the country's leading machinery companies, built what is called the Campbell type top roll. In Campbell the shafts remained stationary and the roll shells rotated about ball-bearings on the shaft.

But the Campbell rolls quickly got out of alignment, losing their bite on the yarn as the strand traversed the roll shell. This caused thin spots in the yarn which would readily break in weaving. Poor quality cloth was the result. Moreover, the Campbell type rolls collected lint in their ball-bearings. The collected lint absorbed grease and interfered with the rotation of the shells. The rolls could not be buffed to true cylindrical shape. For these reasons textile mills used the Campbell rolls only for drafting roving and found them entirely unsuitable for fine spinning.

■ Recognizing the existing problems, Cotchett began with patent No. 2,525,591, granted October 10, 1950, on application filed January 18, 1945. In this top roll the inner cones are slidable on the shaft, but the outer cones are not, being press-fitted onto the ends of the shaft, and rotated with the shaft. The ends of the shaft were sealed. There were no removable end caps and the roll could not be disassembled. A coil spring was mounted on the central shaft interposed between the two inner cones and separating them axially from each other. The top rolls of this patent were not successful. Lint got into the bearings, the rolls jammed, and the parts could not withstand the wear and tear of daily operation. Defendants admit that "the top rolls of this patent were not successful", are "obsolete" and "not commercially important." [See defendants' proposed findings of fact No. 24.] This Court holds all the claims of this patent invalid on the ground that they fail to disclose an operable device constituting such an advance over the prior art as to constitute invention. Plaintiffs are entitled to a judgment declaring that patent No. 2,525,591 is invalid for lack of invention. Other matters raised with respect to that patent need not be considered.

Recognizing the inadequacy of his first effort, Cotchett tried various improvements. He caused Machinecraft to man-

ufacture different types of top rolls involving these improvements. Virtually every one of these improved Machinecraft rolls had a shaft, and in combination therewith members comprising shell rolls, cones, and cone-spacing means all freely slidable along such shaft, bearing balls rolling on the cones and supporting the shell rolls for rotation about the shaft. Illustrative of one improved version of such a roll is the drawing Exhibit M–11–A; and an exemplification of such a roll is Exhibit M–8–A. Thirteen of these improved versions also had a lint trap. See Exhibit M–5.

Machinecraft was concerned to gain knowledge as to whether these improved rolls were or were not satisfactory from a technological standpoint. It did not have as a primary or as even an important purpose to make a profit on any sales or transfers of these rolls until they were fully tested technically.

Motivated by its purpose of gaining knowledge, Machinecraft sold 12 rolls to Springs Cotton Mills on May 21, 1948 and 400 rolls to Columbia Mills on May 28, 1948. It is uncertain just what type of roll was involved in this second transaction. But decision of that uncertain issue is unnecessary, since that second transaction like the first transaction was governed by the seller's primary intent to learn more about its success or failure in mastering the art. There was, therefore, not the type of "public use" or "sale" referred to in 35 U.S.C. § 102(b). Cf. Aerovox Corp. v. Polymet Mfg. Corp., 2 Cir., 67 F.2d 860; National Biscuit Co. v. Crown Baking Co., 1 Cir., 105 F.2d 422; Lyon v. Bausch & Lomb Optical Co., 2 Cir., 224 F.2d 530.

The same experimental quality characterized all the transactions which are embodied in or referred to in Exhibits M–5, 7, 8, 9, 10 and 11. And individually and collectively these transactions did not constitute "public use" or "sale".

Even after these experimental transactions, Machinecraft had not gained adequate knowledge effectively to meet the problem presented. Cotchett recognized this. So did the purchasers. Despite the willingness of several textile factories to risk money on what was for them a test shipment, they were not satisfied. The orders were not renewed. The operations were a failure. Commercial success was not achieved. The problem remained unsolved.

It was not until Cotchett patent No. 2,644,202, granted July 7, 1953, on application filed June 8, 1949, that Cotchett and Machinecraft mastered the theretofore intractable difficulties. What was required Cotchett finally realized were threaded caps whereby ready adjustment of all the component parts on the central shaft could be secured first at the Machinecraft plant and then by unskilled labor at the textile factories. The importance of this in combination with the other features of the Climax roll was fully explained in the lengthy specifications of patent No. 2,644,202. And reference to this final twist or element in the combination was, for example, set forth in that clause of claim 13 which emphasized "stop means on a terminal portion of the shaft limiting outward movement of the outermost cone at such end of the shaft."

Stated succinctly, the essence of the combination as finally developed can be summarized in these next three sentences. All the parts were made axially slidable on the central shaft, and their adjustment and the bearing tension was secured from end caps threaded on the ends of the shaft. The control shaft ends in reduced portions on which the end caps are screwed, leaving shoulders which furnish stops for the end caps. The total length of all the parts assembled on the central shaft is somewhat more than the distance between the two shoulders on the central shaft.

The foregoing combination constituted the invention. It was operable. It was an instantaneous commercial success. It had a great vogue. And disclosure was complete in claims 13 and 15 which read as follows:

"13. A top roll for fiber drawing mechanism comprising a shaft, and

in combination therewith members comprising shell rolls, cones, and cone-spacing means all freely slidable along such shaft, bearing balls rolling on the cones and supporting the shell rolls for rotation about the shaft, stop means on a terminal portion of the shaft limiting outward movement of the outermost cone at such end of the shaft, and a sleeve axially movable on the shaft to bear inwardly against the outermost cone on the other terminal portion of the shaft to remove end-play between the respective members slidable on the shaft throughout the interval between the sleeve and the stop means."

"15. A top roll for fiber drawing mechanism having in combination a shaft, shell rolls, anti-friction bearings supporting the shell rolls for relative rotation about such shaft and including a plurality of inner races all freely slidable along the shaft for the full length thereof, spacing means freely slidable along the shaft holding two of the inner races in predetermined spaced relation to fix the spacing of the shell rolls from each other, stop means at one end of the shaft arresting movement of the parts thereon off from such end, and means on the other end of the shaft adjustable axially to take up end-play between the spacing means and its adjacent inner races."

This same Cotchett patent No. 2,644,-202 describes a lint trap, which is a peripheral groove 43 provided in the cone 21 between the ball-bearings in the outer end of the cone. An inclined shoulder or ridge is shown on the inner surface of the roll shell opposite the thin entering crevice between the cone and roll shell, which serves to deflect any entering lint toward the axis of the cone. The line collected in the groove forms an effective seal of fibers, but the trap does require occasional inspection to make sure that the accumulated lint does not impede free rotation of the rolls. Tpyical claims covering this aspect of the patent are 17, 18, 19, 25, and 26 which read as follows:

"17. A top roll for fiber drawing mechanism having in combination a shaft, a shell roll rotating thereon, means on the shaft defining a peripheral groove located within the shell roll and outwardly of the bearing surfaces between the shell roll and shaft, and means on the interior surface of the shell roll intermediate the width of the groove deflecting fibers entering between the shell roll and the shaft down into the groove."

"18. A top roll for fiber drawing mechanism having in combination a shaft, a shell roll encircling such shaft, anti-friction bearings supporting the shell roll for rotation around the shaft, and means on the shaft obstructing the entry of fibers to a bearing and having a groove lying within the shell roll, the latter having means in connection with its inside surface located adjacent and axially inward of the outward wall of such groove to divert entering fibers into the groove."

"19. A top roll for fiber drawing mechanism having in combination a shaft, a shell roll encircling such shaft, anti-friction bearings supporting the shell roll for rotation around the shaft, and means on the shaft obstructing the entry of fibers to a bearing and having a groove lying within the shell roll, the latter having a portion of the inward surface defining the passage through such shell roll projecting in a direction toward the axis and into the groove."

"25. A top roll for fiber drawing mechanism, having in combination a shaft, a shell roll encircling such shaft, bearing balls between the shaft and the roll, a bearing element on the shaft engaged by the bearing balls, having a flange substantially closing the passage through the roll at one end of the latter and a lint trap located inwardly of such flange in the axial direction, and a ball cage

of substantially tubular cross-section having lateral apertures and holding the balls in spaced relation in a common plane, the bearing element having a ball race formed by a groove both sides of which have a diameter greater than the normal radial displacement permitted to the balls by the cage, whereby the balls are held in place in such groove during the assembling of the roll."

"26.  A top roll for fiber drawing mechanism having in combination a shaft, a shell roll encircling such shaft, bearing balls between the shaft and the roll, a bearing element on the shaft engaged by the balls and having a grooved portion forming a lint trap, the shell roll having a cup formed on its interior surface forming a ball race, the walls of which cup extend continuously axially beyond the balls to house both walls of the groove forming the lint trap."

This patent did solve the problems of providing a low cost roll, which included easy and proper adjustment of the parts in assembly by an unskilled person, and which could be disassembled for inspection, repair and lubrication in the factory and then reassembled in the textile mill.

Nothing in the prior art anticipated Cotchett patent No. 2,644,202.  Cob No. 2,315,936 merely shows a solid type roll in which shell and shaft rotate as a unit; there is no possible adjustment of the bearing fit and bearing tension.  Courtney No. 2,415,578 disclosed sealed ball-bearing units which cannot be adjusted for fit or tension of the bearings.  Campbell No. 2,628,521 does not show two rolls manually adjustable from end caps or a grooved lint trap; it has all the infirmities of the original Campbell ball-bearing top roll.

Without consideration of other claims, claims 13, 15, 17, 18, 19, 25, 26 and 32 of patent No. 2,644,202 are adjudicated valid.

These valid claims were infringed by plaintiff Progressive in manufacturing and selling its Progressive top rolls, de-fendants' exhibits L and M.  The fact that the cones of Progressive have their ends abutting does not avoid infringement.  The total length of the parts slidable on the shaft is more than the distance between the shoulders of the shaft; the end caps threaded on the shaft are used to take up the end play and provide manual adjustment of the bearing tension.  It is immaterial that Progressive by butting his cones together, end to end, sets a limit to the distance that the balls can approach the ball race of the roll shell.  To be sure, by butting its cones together Progressive provides a stop against excessive bearing tension against the balls in their races.  The Progressive cones are made reversible, with the long side and the short side, whereby one set of cones is .005 inch nearer the end of the cone than the other, and, depending on the fit between the parts, Progressive reverses the cones, using either the long side or the short side to fit the ball-bearings in the adjacent races provided by the slanting shoulder on the inside of the roll shell.  The effect of this is to infringe claim 32 of Cotchett patent 2,644,202 for Progressive uses its end caps or sleeves "to take up end play between the several members of the said assembly of parts by engaging with certain of the cones."

Progressive has infringed claims 13, 15, and 32.

In view of a common principle of estoppel applicable to both patent No. 2,716,780 and patent No. 2,755,515, it is appropriate to treat them together.

First to be described is Swanson patent No. 2,716,780 granted on September 6, 1955, on an application filed by Swanson February 16, 1952.  It relates to the use of a flexible washer along the central shaft to provide automatic self-adjustment of the parts and the bearing tension.  This patent provides automatic adjustment rather than the manual adjustment of Cotchett No. 2,644,202.  Here the end caps are screwed on to the reduced ends of the central shaft until they abut against the stop shoulders and the automatic adjustment of accumulated tolerances between the component parts

and the bearing tension is achieved by the use of a resilient washer, shown in the patent as a bent spring washer.

Second, to be described is Cotchett and Swanson patent No. 2,755,515 granted July 24, 1956, on an application filed April 16, 1951. It covers a felt lint seal comprising felt washers backed by a metallic split ring washer provided on the central shaft between the end of the roll and the ball-bearings. The felt washers make a wiping contact against the interior surfaces of the bosses forming parts of the roll shell. The felt washers prevent the lint reaching the bearings. Only claim 4 of this patent is in suit. It provides:

"4. In a top roll for drawing mechanism, in combination, a shaft, a roll shell, anti-friction bearings between the shaft and the roll shell, comprising outer race members in connection with the roll shell, stationary inner race members on the shaft within the outer race members, and rolling elements between the inner and outer race members, an end cap screwed onto the end of the shaft, a barrier of yielding material disposed concentrically of the shaft and between the end cap and the rolling elements, and held by engagement with a stationary race member from rotation with the roll shell and a removable annular member bearing against said barrier to hold it under axial compression and thereby expanding the barrier into wiping contact with the interior of the roll shell, the said inner race member and barrier being held from outward axial movement by the end cap."

Inasmuch as plaintiff Swanson was the applicant for patent No. 2,716,780 and was a co-inventor of patent No. 2,755,515 he and Progressive Engineering, Inc., which he helped to organize are both estopped to deny the validity of these two patents.

The evidence shows that the accused Progressive top rolls infringe all the claims of patent No. 2,716,780 and the fourth claim of Cotchett and Swanson patent No. 2,755,515.

We turn to the phase of this case other than validity and infringement of the patents.

Defendants' claim that plaintiffs have competed unfairly rests on the thinnest evidence. Plaintiffs' rolls have many of the same dimensions and same aspects as defendants' rolls. And in one, but only one, instance at the request of a textile mill Progressive rebuilt some of defendants' rolls by substituting Progressive's parts. The surrounding circumstances show that the situation was so exceptional as not to justify an ultimate conclusion adverse to plaintiffs.

It is, of course, true that the individual plaintiff Swanson was trained under Cotchett, had the benefit of experience at Machinecraft, Inc., and is now using his knowledge to compete against Cotchett and Machinecraft. But this is in itself not unfair as a matter of law. Nor is this Court persuaded that Swanson learned at Machinecraft a trade secret with respect to a "Top Roll Analyzer" which he has since utilized in breach of his trust or of a confidential duty. The analyzer had not reached such a state of development at Machinecraft when Swanson left as to constitute a trade secret as distinguished from tentative explorations.

Defendants are not entitled to judgment on the fourth aspect of their counterclaim. And for the same reasons plaintiffs are entitled to an adjudication that Swanson has not committed a breach of his confidential relations with defendants.

With respect to the claim of false marking in violation of 35 U.S.C. § 50, the evidence is also not persuasive. Plaintiffs first marked their top rolls "Patent Pend.", then "Pat. No. 2,704,393", and finally "Patent Pend." Before this suit was filed, at the suggestion of one of their customers, plaintiffs had removed the designation "Pat. No. 2,704,393" and reverted to the designation "Patent Pend." The argument is that

even this latest description is erroneous because, so it is contended, the pending applications of Progressive do not cover the particular types of rolls to which it is affixed. But the argument goes beyond the evidence and is rejected. Moreover, the Court finds that there is no evidence that either plaintiff intended to deceive the public. Hence, in any event, defendants are not entitled to prevail on that part of the counterclaim resting on 35 U.S.C. § 50.